ANDREW JOHNSTON, Appellant, v. HARRIET C. LINDER et al., Appellees.

**DEEDS: Genuineness—Rare and Unprecedented State of Evidence.**
1 To impeach a deed to real estate on the ground of forgery, the testimony must be clear, satisfactory and convincing, and something more than a bare preponderance in the balancing of probabilities. Under a singularly rare and unprecedented state of evidence, contradictory and irreconcilable, *held*, there was such evidence of the genuineness of a deed as to support the judgment of the lower court.

**EVIDENCE: Opinion Evidence—Direct Evidence—Comparative**
2 **Value.** Opinion evidence must yield to positive and direct evidence.

*Appeal from Jefferson District Court.*—HON. C. W. VERMILION, Judge.

THURSDAY, OCTOBER 23, 1913.

.REHEARING DENIED TUESDAY, JANUARY 19, 1915.

· ANDREW JOHNSTON, now deceased, a devisee under the will
of John Linder, deceased, brought this action to partition a
certain tract of land, containing 498 acres, which, it is claimed,
was owned by Linder at the time of his death, making Harriet
C. Linder, surviving widow, and certain other parties, who
claimed some interest in the land, parties defendant.   The
defendants averred that they owned the real estate in contro-
versy at the time of the death of Linder and that plaintiff
never had any interest therein.   They set out in their answer
what purports to be a deed from John Linder and his wife,
Harriet C. Linder, to defendants, other than Harriet, for the
entire property, subject only to a life estate in the grantors
named.   The grantees are the children and grandchildren of
Harriet C. Linder, but were not related, save by marriage, to
John.

· Plaintiffs, in reply, denied the execution or delivery of
the deed, alleged that it was a forgery and denied the genu-
ineness of the signature of John C. Linder.

On these issues, the case was tried to the court, resulting
in a decree dismissing plaintiff's petition and.he or his widow
and heirs, who have been substituted, appeal.—*Affirmed.*

*Leggett & McKemey,* for appellant.

*McNett & McNett* and *Chester W. Whitmore,* for· ap-
pellees.

DEEMER, J.—The sole issue in the case is one of fact and
that is, Was the deed in question executed and delivered by
John Linder, before his death?   On its face, the deed purports
to have been executed on the 29th day of
1. DEEDS: genu-
ineness: rare
and unpre-
cedented state
of evidence.
May, 1903, and to have been acknowledged on
the same day, before Edward R. Best, as
notary public in and for Jefferson county,
Iowa.   It was not filed for record, however, until May 3, 1910,

which was some days after the death of John Linder, he having departed this life on April 21, 1910, apparently seized of a fee simple estate in the lands.

On the 20th day of April, 1910, deceased Linder made a will whereby he devised all his estate, both real and personal, subject to the share that his widow was, by law, entitled to, to Andrew Johnston, the plaintiff herein, and in the event of his death, to his heirs. This will was duly admitted to probate and thereunder plaintiff claims title to all, save the widow's one-third of the land, now in controversy. The case has had a rather remarkable history and the record is very voluminous and, although but a single ultimate question of fact is involved, there are many side lights of more or less importance, which are unusual in character and difficult of satisfactory explanation. These things will appear as we proceed.

John Linder was the sixth husband of Harriet C. and at the time of his death had been married about nine years, although then living apart from his wife. He had no children; but his wife had three, the result of her first marriage to a man by the name of King. These children, or their successors, are defendants in this case. Harriet C. Linder acquired title to 400 acres of the land in controversy through her third husband, Freeman Wright.

Before her marriage to Linder, she had become much involved, and about two years before her sixth venture on the matrimonial seas, she conveyed 437 acres of the land to E. A. Howard and J. E. Roth, who assumed and were to pay off all her liabilities, and who leased the land to Mrs. Linder at a yearly rental of $1,000.00, agreeing to reconvey upon payment of $22,000.00, within two years from the date of the conveyance. Mrs. Linder did not make this payment and the matter ran along until January of the year 1901, when, having found a purchaser for the land, they served notice upon Mrs. Linder, then known as Mrs. Duncan, of their intention to forfeit the contract. This notice was served February 6,

1901. John Linder was a farmer, then residing in Illinois and, about February 10th of the same year, pursuant to some correspondence between him and Mrs. Duncan, with reference to her farm and also to a proposed marriage, appeared upon the scene, and February 20th of the year 1901, he (Linder) redeemed the land from Howard and Roth, paying them the sum of $22,000.00. This was done in the name of or with the consent of a Mrs. Ruddle, to whom Mrs. Duncan had assigned her right of redemption. Upon redemption being made, Howard and Roth conveyed the land to John Linder. On February 27th, Linder and Mrs. Duncan were married, and they immediately took up their residence upon the farm. From the beginning they had a stormy time of it and in April of the year 1908, Mrs. Linder left her husband and began an action for divorce alleging that the rightful ownership of the farm had really been in her all the time, and that he had agreed to convey it to her and her children at his death, but had failed and refused to do so. She caused a writ of attachment to be issued against his property and levied on the land. She procured an order for temporary alimony for $700.00 on the ground of his ownership in the land and his consequent ability to pay it and this amount was actually paid to the clerk by the husband. In December, 1908, the divorce case was tried and resulted in a dismissal of the charges and counter charges, the costs, including $900.00 attorneys' fees being taxed against the husband; and he was ordered to pay his wife $40.00 per month for separate maintenance. These amounts she had the court make a special lien on the lands in question. An appeal was taken by the husband and while the appeal was still pending, he met with an accident which ended his life, April 21, 1910. From the time she began the action for divorce in April, 1908, down to the time of his death the wife had lived apart from her husband. About one week after his death, she took possession of the farm and produced the deed which is in controversy in this case. It purports to have been executed May

29th, 1903, which was about two years after their marriage and more than five years before their separation. The divorce case had been bitterly contested in the district court, the trial occupying twelve days in which every possible claim and counter-claim as to the ownership of the land had been fought over. The wife contended that Mr. Linder promised before he married her, that the farm should go to her children at his death and that he had agreed to sign a paper which she said she had prepared to that effect, but that he had put her off until after they were married and then he absolutely refused to sign it. Her son, D. H. King, her daughter, Nancy Ruddle, and others testified to the same effect. Mr. Linder denied the entire transaction, said he had never made any such promises and that he had never seen the paper she produced, until it was brought into court; that he paid full value for the farm and $2,000.00 more than it was actually worth, and had never agreed to pay anything to his wife's children or that the farm would go to them.

Upon taking his appeal from the decree in the divorce case, Linder applied to an agent of a surety company for a supersedeas bond and in answers to questions as to his property, stated that he was the owner of the 498 acres of land in controversy, and upon the strength of his representations, the surety company signed his bond, which it has since been compelled to pay.

The deed, under which defendants claim, was not filed for record until after the death of John Linder. Witnesses, expert and non-expert, were examined on the part of each of the parties to the case and the trial court limited the number of experts which each might use to six. Plaintiff used his full quota, but defendants used four only. In addition thereto, a large number of genuine signatures, made by John Linder at various times from the year 1901 down to the time of trial, were offered in evidence for comparison with the ones in dispute. Of the four experts used by defendants, but one had even seen Linder write his name and they gave their opinion

from comparisons of the genuine with the disputed ones. Of plaintiffs' witnesses, three were well acquainted with Linder's signature and spoke of their own knowledge and belief. Six gave their opinions from comparisons, and one of these was a skilled expert—Marshall D. Ewell. Each and all of these testified that the disputed signatures were forgeries. If this were all, there could not be much question of plaintiffs' having made out a case. Aside from this is the fact that the deed in question purports to have been acknowledged by a notary public on the day it bears date and this notary was a witness for the defendants. The law is well settled that to impeach such a deed, the testimony must be clear, satisfactory and convincing. It should amount to more than a preponderance in the balancing of probabilities and should, by its completeness and reliable character, fully and clearly satisfy the court that the certificate of the notary is untrue and fraudulent: *Ford v. Ford,* 6 L. R. A. (N. S.) 442 and note; *N. W. Life Ins. Co. v. Nelson,* 103 U. S. 544 (26 Law Ed. 436) ; *Gritten v. Dickerson,* 202 Ill. 372 (66 N. E. 1090) ; *Blakesburg v. Burton,* 156 Iowa 671.

In addition, something like nine witnesses testified more or less directly to the making and delivery of the deed; and of this number, two, one the notary and another a neighbor, were disinterested, save perhaps as the notary was trying to establish a signature which purports to be his, upon a paper which is impressed with his seal. The other witnesses were, however, more or less interested. John Linder is dead, and, of course, his mouth was closed but some support is claimed from declarations made by him regarding his failure to deed the land to Mrs. Linder's relatives. Were it not for this direct and positive testimony, we should have more trouble with the case than if it rested upon opinion testimony alone, and with it, the case is by no means clear. Indeed, we have rarely had a case which has given us more trouble on the facts and our conclusion has not been arrived at without great hesitation and fear that we, perhaps, have been misled by the great

array of testimony in support of the deed. In such cases, where the witnesses were before the trial court, we must of necessity place some value upon its finding and this, in case of doubt, may properly have weight. *Schurz v. Schurz,* 153 Iowa 187; *Kirkpatrick v. Greenland,* 147 Iowa 37; *Kent v. La Rue,* 136 Iowa 113, and cases cited.

It is useless to attempt a close analysis of the testimony; for, as already observed, the record is very lengthy and anything like a fair statement of the many points relied upon in confirmation of the disputed signature and of the matters which, it is claimed, tend to prove that it is a forgery, would require many pages of printed matter, and even then the parties would not, perhaps, be convinced of the correctness of our conclusion, feeling that some matters had been overlooked. Moreover, such an opinion would be of no benefit to anyone, except to demonstrate, perhaps, a thorough consideration of the case. This, however, may be assumed from the fact that we have held it over several periods and have given it most painstaking consideration.

Mrs. Linder acquired the title to the bulk of the land from one of her husbands, Freeman Wright. It came pursuant to a claimed antenuptial settlement made between them and as the result of a controversy with the Wright heirs, which resulted in Mrs. Linder's paying to these heirs a certain sum of money.

When John Linder heard of his opportunity for marriage, he, under an assumed name, made rather diligent inquiry regarding the then Mrs. Duncan's property and the number of her children and was informed that these children had or claimed some interest in the land. It is shown that she (Mrs. Duncan) had, previous to that time, recognized that she was indebted to them in considerable sums and claims that she put some of their money into the lands. It is also claimed that John Linder agreed to an antenuptial settlement before his marriage and such a paper is produced, signed by Harriet C. Linder alone, in which it was agreed he was to

take title to the land in his name and when married, that the
property was to belong to his wife, and at her death, was to
go to her children and their heirs. Provision was also made
with reference to the repayment to these children of $9,000.00
in notes claimed to have been held by them. John Linder
invested but $5,000.00 in the land and while he made a mort-
gage thereon to secure the balance of the purchase price or
of the amount to redeem from Roth and Howard, he had the
use of the farm until his death and never paid anything else,
save to reduce the incumbrance to the extent of $1,000.00.
About two years after the marriage, Mrs. Linder went to her
attorneys, doubtless about this antenuptial contract, and also
with reference to a deed, and at her request these attorneys,
some time in April of the year 1903, draughted the deed for
the property which is the subject of dispute, and on May 1st
sent the same, with some other deeds and two copies of a con-
tract between the parties, to Mrs. Linder, by express.

This deed purports to have been signed on May 29, 1903,
and the marriage contract, which Mrs. Linder says was to be
made before the marriage was consummated, also bears what
purports to be the signature of John Linder, in addition to
that of his wife. Many witnesses (of whom some were incom-
petent under Sec. 4604 of the Code), including the notary
public, testified with great positiveness and directness to the
actual signing by John Linder of both the antenuptial con-
tract and the deed. They tell us that it was on a birthday oc-
casion and the time is also identified by a disinterested witness,
who fixed the date with reference to a receipt held by him;
and, unless these witnesses are held to be deliberate perjurers
and some of them forgers, the deed must be sustained.

One trouble with plaintiff's case is that he has to prove
too many forgeries in order to discredit the showing made
for the defendants. Some of the witnesses, as we have already
said, were incompetent because of interest, under Sec. 4604
of the Code; but their testimony was corroborative of other
testimony from entirely competent and disinterested wit-

nesses. The deed seems to have been turned over to a Dr. King, one of the defendants in the case, and it appears that in some way, it got mixed up with his father-in-law's papers, which had been left with him for safe keeping, and was only discovered by much searching after the death of John Linder. This testimony shows that practically all of the grantees had knowledge of the deed at the time it was made, and out of this fact grow many suspicious circumstances relied upon by the appellants. One is, that the deed was not immediately recorded and was not filed for record until after the death of the grantor, John Linder. No explanation is made of this failure to record, save that within a year or more after its making the deed seems to have been lost or mislaid, as already indicated. Trouble almost immediately arose between this man John Linder and his many times wedded wife, which resulted in a divorce suit, brought by her in the month of April, 1908. As much reliance is placed upon this, we here copy a part of the petition filed in that case:

"4. That at or about the time of her marriage to defendant, plaintiff was the owner of four hundred and forty-seven acres of farm land lying in sections Nos. 19 and 30 in Locust Grove township, of said Jefferson county, Iowa, adjoining the town of Batavia and extending some two miles north, including improvements in the way of house, barns and outbuildings erected on said farm by plaintiff at an expense of some five thousand three hundred dollars, the value of said farm being Fifty-five Thousand Eight Hundred and Seventy-five Dollars, or $125 per acre, or thereabouts, subject to indebtedness at that time of about Twenty-two Thousand Dollars making her net assets in said farm some thirty-nine thousand one hundred and seventy-five dollars; aside from which she had on said farm at that time live stock and personal property of the value of three thousand dollars, making her total net worth more than forty-two thousand dollars, ($42,000).

"5. That all of said property aggregating in value said forty-two thousand dollars and more, said defendant has wrongfully appropriated and converted to his own use and benefit and wrongfully claims the title to same and denies the title and ownership of plaintiff therein.

"6. That said defendant has invested some five thousand dollars in said farm by reducing the indebtedness thereon, and some $250.00 in the personal property thereon which was increased in value some fifty-eight hundred dollars ($5,-800.00).

"7. Defendant owns some fifty-one acres of land, aside from said farm, and which farm so owned by him and which is situated in said Jefferson County, is worth about five thousand one hundred dollars and is subject to an indebtedness of $1,900.00."

The prayer of the petition was that "upon final hearing of this cause she be granted an absolute divorce from defendant; that she be restored to her rights in the 447 acre farm aforesaid, together with the personal property thereon justly belonging to her, or its equivalent free from any and all right, title and claim of defendant; or in lieu thereof, that she be granted permanent alimony in the sum of twenty-five thousand dollars, and for such other and further relief, both general and special, as to equity may seem meet, together with judgment for costs of this action."

Various motions were made for temporary alimony and support fund, which were supported by affidavits made by some of the defendants in the present case, and to which John Linder filed counter-affidavits, and it may here be said that some of the affidavits were contradictory in effect, if not in terms, with the testimony given by the affiants on this trial. John Linder answered and among other things, pleaded the following:

"4. As to the property interests of the plaintiff at the

time of their marriage, defendant states that said plaintiff owned only some old household goods of little value and perhaps an equity in two or three houses and lots in Batavia, Iowa, heavily encumbered.

"5. Defendant denies that the plaintiff at the time of their marriage owned the 447 acres of land lying in Sections nineteen and thirty or any improvements thereon in Locust Grove township, Jefferson County, Iowa, and denies that she held or had any interest therein, and he denies that she owned the live stock or personal property on said farm, excepting the household goods and one dozen chickens.

"This defendant states affirmatively that said 447 acres of land described in her petition was bought by him not from the plaintiff but from others, and out of his own funds in which plaintiff had no interest, and that said land was purchased and paid for with his own money, subject to the incumbrances now thereon which were given by him for money used in the purchase and which he is obliged to pay. And as to the fifty-one acres of land described in her petition defendant states that he purchased same with his own money and funds, subject to the indebtedness now thereon, which represents part of the purchase price thereof and he denies that he has appropriated the property of plaintiff to his own use as alleged."

He also filed a cross-petition from which we extract the following:

"4. That the plaintiff disregarding her marital vows and duties as a wife since her said marriage to this defendant, has been guilty of such cruel and inhuman treatment of him as to impair his health and endanger his life in this, that shortly after their marriage, the plaintiff began to manifest toward the defendant, a disposition to annoy and aggravate him, scheming in divers ways with other persons to cause him trouble. She annoyed and aggravated defendant in various ways and manners which rendered the marriage relation un-

happy by reason thereof, and destroyed his peace of mind and
happiness. Plaintiff schemed to deprive him of his prop-
erty, finally resulting in plaintiff threatening to shoot and
kill this defendant and she attempted to procure and hire
others to do so and she made threats to take his life and he
has reason to believe his life in danger from her.

"He therefore asks the court and prays that he be
granted a divorce from the plaintiff on this his cross-bill
and that the title to the real estate above and heretofore
described herein be quieted in him and that for the reason
shown herein, said plaintiff be denied any interest whatever
therein and that all rights, titles or interest that the plaintiff
might claim or make to any of his property real or personal
by means of their marital relations, be cancelled, annulled and
held for naught, and that he be granted such other and fur-
ther relief as in equity and justice the evidence may show him
entitled with costs."

On these issues the case was tried in the district court
upon testimony adduced, pro and con, and the singular thing
about it is that no witnesses on that trial, although many were
the same as used on the trial of this case, referred to the deed
of May 29th, 1903. The excuse given for this is that Mrs.
Linder told her counsel of the deed and that she was unable
to find it and believed it was destroyed and that she was ad-
vised by counsel not to say anything about it for the reason
that John Linder would deny it just as he had everything
else in the case. This testimony is uncontradicted, although
we must confess that such advice was a little singular in view
of the issues made on the trial. Still more strange is it in
view of the fact that the grantees in this deed gave testimony
in support of the claim made by their mother, the plaintiff in
the action. But such is the record in the case. The result of
that divorce case was a decree dismissing defendant John
Linder's cross-petition and making the following findings and
final orders:

"Upon plaintiff's petition and the evidence the court finds that defendant has subjected plaintiff to cruel and inhuman treatment such as would justify a divorce to her were she an innocent party, but, that she was herself at times disagreeable, and having been three times before divorced and in other respects not having shown such equities as entitle her to a divorce, a decree of divorce in her favor is denied, to which ruling plaintiff at the time duly excepts.

"The court however finds that the conduct of defendant towards plaintiff, and the mistreatment he has subjected her to, has been such as to justify her in separating and remaining away from him and refusing to longer live with him; and that plaintiff is entitled to a sufficient allowance from the defendant and out of the property now standing in his name, and the income therefrom to enable her to live separate and apart from defendant; and the court further finds that the sum of forty dollars per month, beginning with January first, 1909, together with such income as plaintiff has from property now in her name, is for the present sufficient for that purpose.

"*Wherefore* the court orders, adjudges and decrees that the defendant John Linder shall during the month of January, 1909, and on the first of each month thereafter, pay to the clerk of said court, for the separate support and maintenance of plaintiff, Harriet C. Linder, the sum of forty dollars per month so long as she lives separate and apart from the defendant; the receipt of said clerk for each installment to constitute a sufficient discharge thereof. And that if any such installment be not so paid when due, judgment shall thereupon be entered against said John Linder for all of said installments so unpaid, and, successive judgments may be entered, and execution may issue upon each judgment.

"The court finds that the defendant John Linder and plaintiff Harriet C. Linder as husband and wife have a vested interest in and to the following described real estate, title to which is held in the name of the defendant John Linder.

"All of which is situated in Jefferson County, Iowa, and all in Township seventy-two north and Range eleven west the following described tracts being situated in section thirty thereof: (here follows description of lands).

"The court at this time, upon the application of plaintiff, refuses to fix or determine the nature or extent of the right, title or interest of either plaintiff or defendant in and to the real estate hereinbefore described, to which plaintiff and defendant each separately at the time duly except.

"The court hereby expressly orders, adjudges and decrees that the findings, orders and decrees in this cause heretofore or now made are, and shall be without prejudice to any action at law or in equity, the plaintiff, or anyone claiming through her, may hereafter institute against the said John Linder with reference to the nature or extent of her or their interest or title to any or all of said described real estate.

"The court further orders, adjudges and decrees that the defendant John Linder shall pay into the hands of the clerk of this court the sum of nine hundred dollars as compensation for the services of plaintiff's attorneys in conducting the actual trial of this cause. If the defendant elects to mortgage any portion of the above described real estate for the purpose of raising the money wherewith to make the payment of said counsel fees herein required by him to be made or to sell not to exceed 40 acres other than the homestead for said purposes, the plaintiff shall join with him in the execution of such mortgage or deed as defendant may elect, and defendant shall in such event pay the aforesaid nine hundred dollars on or before March 1, 1909, likewise the unpaid costs of this action, and the additional suit money herein provided for. Should the defendant not elect to raise said moneys by the execution of such mortgage or deed then the aforesaid nine hundred dollars shall be paid by him in three equal installments of three hundred dollars each, payable March first, 1909, May first, 1909, and August first, 1909, with interest at the rate of six per cent per annum upon each unpaid

installment.  And if any such installment is not paid when
due the clerk of the court shall thereupon enter judgment
against said John Linder for each installment so unpaid at
maturity, and execution may issue upon the same in plain-
tiff's name for the use and benefit of her said attorneys.  And
to this order requiring the defendant to pay the sum of nine
hundred dollars as fees for plaintiff's counsel the defendant
at the time duly excepts.

"This order and decree requiring defendant to pay for
the separate support of plaintiff the sum of forty dollars per
month, and requiring him to pay the fees of her attorneys in
this cause in the sum of nine hundred dollars is hereby de-
clared to be a lien upon all of the land hereinbefore described,
to which order defendant at the time duly excepts."

It will be observed that the trial court expressly refused
to settle the title to the land but did make the money judgment
a lien thereon, perhaps on the theory that John Linder, the
defendant, had a life estate therein, or at any rate some such
interest as that a judgment would attach thereto.

The appeal taken from that decree was never disposed
of in this court on the merits, due to failure to file abstract
in time, or upon some other technical ground, and the only
thing happening thereafter which has any bearing upon the
case is that John Linder, in order to secure his appeal bond,
made affidavit that he was the owner of the land.  Declara-
tions made by John Linder after the time the deed in contro-
versy bears date are offered to show that he was then claiming
title to the land and that his controversy with his wife was
over the title, she wanting him to convey it to her children,
which he refused to do.  These declarations, however, we do
not regard as competent, for they were not made as explana-
tory of his then possession and were in disparagement of what
purports to be a prior deed from him.  Some of defendants'
witnesses are placed in such a position by reason of their atti-
tude and their testimony in this divorce proceeding that we

must refuse to believe them. They could not have told the truth on both occasions and why they should have thought it of any advantage to cover up the transaction relating to the making of the deed to them, we are unable to fathom.

If the case stood alone on the expert testimony and a comparison of the signatures, we should be inclined to hold with appellants; but such testimony is never conclusive in character and must yield to positive and di-

2. EVIDENCE: opinion evidence: direct evidence: comparative value.

rect evidence and this is peculiarly so where the instrument is duly acknowledged and the notary himself testifies directly to the facts concerning the acknowledgment. True, this notary gave some contradictory accounts of the matter, but he finally explained this by saying that he had confused two occasions when he took Linder's acknowledgment and upon this last trial, made a fair explanation of this confusion.

As a necessary rule to the security of land titles, it has frequently been held that testimony from experts, as to the genuineness of a signature, and the results of comparisons made by court or jury are of the most unsatisfactory character.

We quote the following from the recent case of *Murphy v. Murphy,* 146 Iowa 255:

"The value of such evidence depends largely on the identification and number of similar characteristics or lack thereof between the disputed writing and the standards. The appearance or lack of one characteristic may be accounted as a coincidence or accident, but as the number increases, the probability of being a mere coincidence or accident disappears, and conviction, as in cases of circumstantial evidence, may become irresistible. The court or jury, ordinarily, will derive aid by a comparison in the light of testimony by experts, *but the non-expert is not able to point out differences or similarities such as mentioned and their testimony by comparison would be of little or no value if received.*

"Testimony of experts by comparison repeatedly has

been *declared of the lowest order (citing many Iowa cases). It has been declared weak and unsatisfactory (citing cases). . . .* Because of its *unsatisfactory character,* the legislature in its wisdom declined to authorize and impliedly declared incompetent evidence by comparison by persons not qualified to mark the distinctions *or similarities on which the value of such evidence depends.*"

In *Borland v. Walrath,* 33 Iowa 130, this court said:

"At all events, a party seeking to defeat his deed, because it was not acknowledged by him, *ought to make a clear case against the certificate of the officer in order to overthrow the instrument.* Public policy demands that instruments in writing pertaining to the titles of real estate, which are authenticated in the manner pointed out by the law, should not be lightly set aside." See, also, to the same effect, *Whittaker v. Parker,* 42 Iowa 585; *Browning v. Gosnell,* 91 Iowa 448; *Blakesburg v. Burton,* 156 Iowa 671.

Our conclusion, after carefully considering the entire case and reading the record many times, is, that while there is much doubt regarding the genuineness of the signature in question and also of the one to the marriage contract, the testimony is not such as to justify us in setting aside the deed, especially in view of the finding made by the learned trial judge. The decree must therefore be, and it is—*Affirmed.*

All the judges concur.